UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VALLEY FORGE INSURANCE COMPANY,

Plaintiff,

No. 03-CV-73118-DT

vs.

Hon. Gerald E. Rosen

MICHAEL KALLIS d/b/a KALLIS CONSTRUCTION COMPANY,

Defendant.
_________________________________/

OPINION AND ORDER REGARDING
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on September 26, 2005

PRESENT: Honorable Gerald E. Rosen
United States District Judge

## I. INTRODUCTION

The above-captioned negligence action arising out of a fire in a clothing store is presently before the Court on Defendant's two Motions for Summary Judgment. The first of these Motions addresses the scope of Defendant's duty with regard to the work

done for Plaintiff's insured. The second Motion addresses the issue of causation.[1] Plaintiff timely responded to both motions.

Having reviewed and considered the parties' briefs and supporting documents, and having discussed this matter in conference with counsel for the parties, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

This matter arises out of a fire that occurred at the European Clothiers store in the Fairlane Town Center Mall in Dearborn, Michigan on April 17, 2002. European Clothiers is owned and operated by Robert Grumet. Plaintiff Valley Forge Insurance Company ("Valley Forge") insured Robert Grumet d/b/a European Clothiers and instituted this action pursuant to its rights of subrogation as Grumet's insurer.

Prior to November 2000, Grumet operated two European Clothiers stores -- one in the Tel-Twelve Mall in Southfield, Michigan and the second, a discount store in the Fairlane Town Center, in Dearborn. In November 2000, Grumet lost his lease in the Tel-Twelve Mall and decided to move his entire business to the Fairlane Town Center location. The move of the entire European Clothiers business to Fairlane required some remodeling of the store. Grumet testified that only minor renovations were needed in the

[1] Defendant filed the first motion for summary judgment in accordance with the motion cut-off set forth in the original Scheduling Order. Because the deposition of Plaintiff's expert was not yet complete as of the original motion cut-off, Defendant was granted leave to file a second supplemental summary judgment motion to address the causation issue based upon the expert's deposition testimony.

Fairlane Town Center store, that what he wanted done was "strictly cosmetic enhancement" and he wanted it done "as fast as possible" so he would not lose any of the after-Thanksgiving Christmas business. [Grumet Dep., p. 11-14.] Grumet defined "cosmetic work" as work that does not require pulling permits. *Id.* ast p. 35.

Jeff Daskel, who was a European Clothiers employee and one of Grumet's good friends, introduced Grumet to Defendant Michael Kallis. Grumet testified that he trusted Daskel and that Daskel told him that for "not too much money," Kallis could do the cosmetic work he needed done. *Id.* at p. 12.

With regard to the deciding what remodeling work was to be done, Grumet testified as follows:

> Everything that -- I decided everything that I wanted done to the store. All the decisions of where to put a dressing room, what color carpet. You know, did I want something? Did I not want something? The decisions were mine and mostly they were mine based upon the Dearborn rulings so that I didn't have to shut down too long or bring in excess contractors. I wanted to do it as fast as I possibly could.

*Id.*

Grumet hired Kallis and paid him $13,480 to do all of the remodeling work in the store. The work included the following:

- Remove carpeting and haul it to the dumpster
- Supply and install new lights
- Remove and laminate signs
- Remove neon and repair drywall around counter
- Prep and relaminate counter
- Supply labor and material to build two new dressing rooms
- Paint new dressing rooms, counter areas, and various other store areas
- Dismantle store fixtures

- Create 6 tables from 3 dismantled clothing tables
- Remove neon from ceiling
- Supply and install 2 fire extinguishers
- Supply and install 2 new exit signs
- Install rear door panic lock and hardware
- Dismantle shelves in warehouse area
- Remove all construction debris
- Clean interior of store

[*See* Invoice No. 112600R at Defendant's Ex. B.][2]

With regard to the removal of the neon lights in the ceiling, Grumet testified that he only wanted Kallis "to remove the light bulbs and paint the surface above the light bulbs. That's what my instruction [to Kallis] was." *Id.* at p. 18. *See also* p. 21 ("My only conversation [with Kallis] was, I don't want these light bulbs in the store. And the wood above it, I needed painted a certain color.")[3]

---

[2] There was no written contract other than the invoice.

[3] The recollection of Jeff Daskel, who was present when Robert Grumet instructed Kallis to remove the neon light bulbs, is substantially the same as Grumet's. Daskel testified:

> A [by Jeff Daskel]: We were all sitting there having a cup of coffee and one thing led to another, and I said, Mike, can we turn these, I mean, can we get rid of these lights, and Bob looked at Mike, and can we do it, you know, I just want to hurry up and be open, and you know, that was it.
>
> * * *
>
> . . . I know they were ugly, and I said to Bob, you know, I'd get rid of these lights.
>
> Q: Do you recall if Mr. Kallis said, I'll take out the bulbs for you or I'll take out the light system for you? Do you remember if there was that distinction?

Kallis performed the work as requested and Grumet was satisfied with what Kallis did: "It came out just the way I had hoped." *Id.* at 38. Grumet testified that after Kallis completed his work, no wires were left hanging from the ceiling; all that was left was a light socket that protruded down from the ceiling about an inch. *Id.* at pp. 20-24. The protruding socket was painted the same color as the ceiling.

The Fairlane Town Center store subsequently re-opened in time for the Christmas rush and continued to do business for the next 18 months without interruption until April 17, 2002. On that date, Jeff Daskel arrived at the mall at approximately 9:40 a.m. to open the store. Daskel followed his normal routine which included deactivating the alarm system and turning on all of the lights, when he noticed the store start to fill with smoke. Daskel observed a fire in the ceiling in the middle section of the store. The fire did not spread from its original location and was contained with fire extinguishers. However, the approximately $1.2 million worth of inventory was substantially damaged.

After the fire, the fire marshal showed Grumet the power source for the removed neon lights that remained in the area above the ceiling. *Id*. at pp. 18-9. Prior to that time,

---

A: No.

Q: Do you remember Bob telling Michael Kallis, I want you to take out the bulbs and de-energize them or I want you to just take out the bulbs, or do you have no recollection of any distinction?

A: I don't have any recollection to none of that.

[*See* Daskel Dep., Defendant's Ex. C, pp.41-43.]

Grumet testified that he knew nothing about the power source and never had any discussion with Mr. Kallis about the power source or disconnecting it. *Id.* It was not until the fire marshal visited the store after the fire that Grumet learned of the "live" power source in the ceiling. He testified:

> The first time I ever knew or was privy to anything in that ceiling was when the fire marshal after the fire said, "Mr. Grumet, why don't you come up on this ladder and let me show you how easily this could have been avoided." And he said, "There's this box here and it goes into a plug and it could have just been unplugged." That's my first and only knowledge of how a neon light is connected to a -- whatever it's connected to, to a power source.

*Id.* at 19.

Grumet was ultimately paid $439,753[4] by the insurance company for the damaged inventory, but he testified that he was paid nothing to repair the store after the fire.

On August 14, 2003, Valley Forge, as subrogee of Robert Grumet d/b/a European Clothiers, initiated this diversity action against Michael Kallis d/b/a Kallis Construction Company. In its two-count Complaint, Valley Forge maintains that Kallis acted negligently and in breach of an implied warranty to perform work in a reasonable manner when he failed to de-energize the power source after he removed the neon light bulbs. Plaintiff further alleges that the fire was the result of Kallis' failure to "otherwise take steps to protect the exposed socket that was left in the ceiling" from dust and debris. [*See* Plaintiff's Response, p. 2.]

In support of its theory, Valley Forge retained, George Wells, a licensed electrical

---

[4] Valley Forge was able to salvage $40,643.

contractor, as an expert. Mr. Wells holds a Bachelor of Science degree in electrical engineering and a Master's degree in business administration. *See* Plaintiff's Ex. D. He is an instructor for the Ohio Industry Examining Board and teaches classes on electrical issues in construction. *Id.* Mr. Wells testified that, in the course of his 30-year career, he has worked on several hundred construction projects in various capacities including as an electrician, a general contractor, an electrical contractor and a consultant. *Id.*

Following the fire, Mr. Wells personally visited the Fairlane European Clothiers store and performed an investigation regarding the cause of the fire. He testified that there was a transformer in a ceiling compartment which was accessible by way of a small door that supplied electrical power to the protruding neon light socket. *Id.* The transformer, which he found to be left in the "on" position, was plugged into an electrical outlet within the same compartment. *Id.*

Wells opined that had the transformer been unplugged from the electrical outlet or the transformer turned "off," the fire would not have occurred. *Id.* He testified that to do either of these tasks would not have required an electrician nor would they have required any specialized training. *Id.* Rather, he said that any contractor in good standing within the trade would have taken these steps as a matter of course when a light fixture is removed. *Id.*

In Wells' opinion, Kallis' failure to de-energize the transformer after he removed the neon light bulb created a dangerous condition and was a proximate cause of the fire.

*Id.* He explained that in the approximately 18 months following Kallis' removal of the neon light, dust particles accumulated in the empty light socket and that these particles became a conductor for an electrical current that ultimately ignited airborne dust particles along an arc track between the socket and a metal wall corner brace. *Id.*

Discovery has closed in this matter and Defendant Kallis now moves for summary judgment contending (1) he had no duty to perform any activities with regard to the subject lights and light fixture other than to remove the neon light bulb; and (2) that Plaintiff has failed to present sufficient evidence of causation.

## III. DISCUSSION

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Chelates Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[5] According to the

[5]"Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid

*Chelates* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Chelates*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."
>
> * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
>
> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1070, 1087 (6th Cir. 1996). *See also,*

---

wasteful trials." 10A C. Wright, A. Miller, M. Kane, Federal Practice & Procedure, § 2727, at 35 (1996 Supp.).

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The Court will apply these standards in deciding Defendant's motions for summary judgment in this case.

B. PLAINTIFF VALLEY FORGE HAS NO RIGHTS GREATER THAN ITS INSURED

Under general principles of subrogation, a subrogee stands in the shoes of his subrogor. *Yerkovich v. AAA*, 461 Mich. 732, 737-738 (2000). A subrogee, thus, "acquires no greater rights than those possessed by the subrogor." *Allstate Ins. Co. v. Detroit Millmen's Health & Welfare Fund*, 729 F. Supp. 1142, 1146 (E.D.Mich. 1990), citing *Federal Kemper Ins. Co. v. Isaacson*, 145 Mich. App. 179, 182, 377 N.W.2d 385 (1985). *See also Auto-Owners Ins. Co. v. Amoco Prod. Co.*, 468 Mich. 53, 59 (2003). As such, the subrogee must establish the necessary elements of the cause of action to the same extent as the subrogor would have needed to prove. *Aetna Ins. Co. v. Loveland Gas & Electric Co*., 369 F.2d 648, 650 (6th Cir. 1966). Similarly, a subrogee's claims against the defendant is subject to any defenses which the defendant might have against the subrogor. *Indiana Ins. Co. v. Erhlich*, 88 F. Supp. 513, 517 (E.D. Mich. 1994), citing *Northwestern Mutual Ins. Co. v. Jackson Vibrators, Inc.*, 402 F.2d 37, 40 (6th Cir. 1968); *Commercial Union Ins. Co. v. Medical Protective Co.*, 426 Mich. 109, 393 N.W.2d 479, 482 (1986).

C. PLAINTIFF HAS MADE OUT A *PRIMA FACIE* CLAIM OF NEGLIGENCE

1. Defendant Had a Duty to Use Due Care In the Performance of His Contractual Obligations So As Not to Endanger Plaintiff's Property

Defendant Kallis argues that Valley Forge has failed to make out a *prima facie* claim of negligence. Defendant's first theory is that Kallis was under no duty to de-energize the power source to the light socket when he removed the neon light bulbs and that absent such a duty, Plaintiff cannot make out a claim of negligence.

In order to establish a negligence cause of action, a plaintiff must show "that the defendant owed a legal duty to the plaintiff, that the defendant breached or violated the legal duty, that the plaintiff suffered damages, and that the breach was a proximate cause of the damages suffered." *Schultz v. Consumers Power Co.*, 443 Mich. 445, 449; 506 NW2d 175 (1993). Whether a defendant owes a duty to a plaintiff to avoid negligent conduct in a particular circumstance is a question of law for the court to determine. *Schmidt v. Young*, 215 Mich. App. 222, 224; 544 N.W.2d 743 (1996). To determine whether the defendant owed the plaintiff a duty, courts examine a number of factors, including the relationship of the parties and the foreseeability and nature of the risk. *Schultz, supra* at 450.

Here, it is undisputed that Defendant Kallis' relationship with Robert Grumet was a contractual one. Defendant argues that his only duty pursuant to the contract was to remove the neon light bulb from the ceiling and he complied with that duty. Kallis' position, thus, is that he had no duty to de-energize the transformer or to take any other action to insure that leaving the empty light socket exposed would not create a hazardous condition. Kallis' argument, however, lacks legal support.

"Duty" is an obligation to conform to a specific standard of care toward another, *Smith v. Stolberg*, 231 Mich. App. 256, 258, 586 N.W.2d 103 (1998), and is essentially a question whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person. *Dykema v. Gus Macker Enterprises, Inc.*, 196 Mich. App. 6, 8, 492 N.W.2d 472 (1992). Such a duty may arise out of a contractual relationship.

It is well-settled in Michigan that accompanying every contract is a common-law duty to perform with ordinary care the thing agreed to be done, and that a negligent performance constitutes not only a breach of contract but a tort, as well. *See Clark v. Dalman*, 379 Mich. 251, 261, 150 N.W.2d 755, 760 (1967); *Williams v. Polgar*, 391 Mich. 6, 19, 215 N.W.2d 149 (1974); *Fultz v. Union-Commerce Assoc.*, 470 Mich. 460, 465, 683 N.W.2d 587 (2004). The Michigan Supreme Court explained this concept in *Clark v. Dalman*:

> Actionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law. The duty may arise specifically by mandate of statute, or it may arise generally by operation of law under application of the basic rule of the common law, which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to unreasonably endanger the person or property of others. This rule of the common law arises out of the concept that every person is under the general duty to so act, or to use that which he controls, as not to injure another.
>
> Such duty of care may be a specific duty owing to the plaintiff by the defendant, or it may be a general one owed by the defendant to the public, of which the plaintiff is a part. Moreover, while this duty of care as

> an essential element of actionable negligence, arises by operation of law, it may and frequently does arise out of a contractual relationship, the theory being that accompanying every contract is a common law duty to perform with ordinary care the thing agreed to be done, and that a negligent performance constitutes a tort as well as a breach of contract.

379 Mich. at 261, 150 N.W.2d at 759-60 (citations omitted). *See also*, *Rinaldo's Constr. Corp. v. Michigan Bell Tel. Co*., 454 Mich. 65, 559 N.W.2d 647 (1997) (Negligence in the performance of a contract can justify the imposition of tort liability only if that negligence has caused physical damage to persons, property, or other tangible things. *Id.* at 84-85. Such negligence is distinctly actionable in tort because contracting to do something does not alter the fact that there is a preexisting duty to avoid physical harm when one acts. *Id*.)

Thus, pursuant to Michigan law, the contractual relationship that Kallis had with European Clothiers imposed upon Kallis a duty to use due care in the performance of his contractual obligations so as not to unreasonably endanger the person or property of others, including that of the Plaintiff. The work Kallis contracted to do for Robert Grumet d/b/a/ European Clothiers included removing the neon light bulb from the ceiling of Grumet's Fairlane Town Center store. Plaintiff's expert, George Wells, testified that any contractor in good standing who contracted to do similar work would, as a matter of course, de-energize an open light socket after removing the light bulb from the socket.[6]

---

[6] Expert testimony is sufficient to prove the applicable standard of care in a negligence action. *See Tiffany v. The Christman Company*, 93 Mich. App. 267, 285, 287 N.W. 2d 199, 207 (1980); *see also O'Neill v. Soils & Structures, Inc.*, 2002 WL 31297196 (Mich. App. 2002) (expert testimony that defendant's work was not in

It is undisputed in this case that Kallis took no action to do so nor did he take any other steps to protect the open and exposed energized socket from dust and debris. Under these facts, it is clear that Defendant is not entitled to summary judgment on the basis of a "lack of duty" on Defendant Kallis' part. Accordingly, Defendant's first motion for summary judgment will be denied.

2. <u>Plaintiff Has Presented Sufficient Evidence of Causation</u>

Defendant also argues that Plaintiff has failed to present a *prima facie* case of causation. Proving causation "actually entails two separate elements (1) cause in fact, and (2) legal cause, also known as 'proximate cause.'" *Skinner v. Square D. Co.*, 445 Mich. 153, 516 N.W.2d 475 (1994). "A plaintiff must adequately establish cause in fact first. Legal cause or proximate becomes a relevant issue only *after* plaintiff establishes cause in fact." *Id.*

As the Michigan Supreme Court explained in *Skinner*, a theory of causation must have a basis in established fact:

> [A]t a minimum, a causation theory must have some basis in established fact. However, a basis in only slight evidence is not enough. Nor is it sufficient to submit a causation theory that, while factually supported is, at best, just as possible as another theory. Rather, the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred.
>
> We have consistently applied this threshold evidentiary standard to a

---

conformity with industry standards held sufficient for reasonable person to conclude that defendant was liable for negligence).

plaintiff's proof of factual causation in negligence cases:

> The plaintiff must introduce evidence that affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced it becomes the duty of the court to direct a verdict for the defendant. The mere possibility that a defendant's negligence may have been the cause, either theoretical or conjectural, of an accident is not sufficient to establish a causal link between the two. There must be substantial evidence that forms a reasonable basis for the inference of negligence. There must be more than a mere possibility that unreasonable conduct of the defendant caused the injury. We cannot permit the jury to guess. Something more should be offered the jury than a situation that, by ingenious interpretation, suggests the mere possibility of defendant's negligence being the cause of the injury.

445 Mich. at 164-65. *See also, Kaminski v. Grand Trunk Western RR Co.,* 347 Mich. 417, 422 (1956) ("There may be 2 or more plausible explanations as to how an event happened or what produced it; yet if the evidence is without selective application to any 1 of them, they remain conjectures only.")

In this case, Defendant contends that Plaintiff's expert's testimony regarding the cause of the fire does not meet the requisites for establishing causation. Mr. Wells opined that the fire was caused by a build-up of dust and moisture that created a conductive path from the energized socket. Defendant, however, points to Wells' acknowledgment that the same conductive path may have been created either with the bulb removed or with the bulb placed back into the socket Defendant interprets this

acknowledgment as an "alternative" theory of causation. In Defendant's view, since a fire-causing conductive path could have formed in either situation -- with or without the bulb in the socket -- there is no cause-in-fact established for Defendant Kallis' alleged negligent omission, and without cause in fact there can be no liability for negligence.

Defendant's interpretation of the expert's testimony, however, ignores one salient fact, i.e., that Mr. Wells' testimony regarding the possibility of a conductive path existing with the bulb in the socket **presupposes that the bulb had first been removed from the socket**. Wells' testimony regarding this matter was as follows:

> Q: . . . You would agree that whether or not this transformer was de-energized, the same amount of dust would be in the air and the same amount of moisture would be in the air?
>
> A: Yeah, there's no -- I don't see any relationship between the two, right.
>
> Q: Right. . . . Since you don't know what the bulb looked like that went in the socket, you would have no way of knowing whether or not it had a seal all the way around the circle of the socket or if it was broken or hexagon or anything?
>
> A: No. It wasn't there so I wouldn't know that.
>
> Q: Okay. Therefore, you would have to agree also that even if the light bulb **was put back into the socket**, there may have been sufficient access for the air to bring dust and moisture to provide the same electrical path because you don't know what it would have been, correct?
>
> A: That's true.

[Wells' Dep., pp. 84-85, Defendant's Second Motion, Ex. E (emphasis added).]

Nothing in Wells' testimony suggests what Defendant would like the Court to find, i.e., that a fire conductive path could have formed had the bulb *never* been removed from the socket. The undisputed aspect of Wells' testimony regarding causation was that the bulb had been taken out and dust allowed to build up in the energized socket. It was the dust that had built up in the energized socket that ignited the arc of airborne particles. Thus, Wells' testimony that putting the bulb back into the energized socket once dust had built up within the socket might not have made a difference does not establish that the fire could have been caused either with or without the alleged negligent omission. In either scenario, it is the fact that the socket remained energized due to Defendant's failure to disconnect the power source that causes the dust particles to ignite. This is sufficient cause-in-fact to withstand summary judgment on the issue of causation.

## CONCLUSION

For the reasons set forth above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Motions for Summary Judgment are DENIED. Accordingly, this case shall proceed to trial on the merits.

s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated: September 26, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 26, 2005, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager